IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>$128,915.00<br>Defendant.<br>_____<br><br>CHRISTOPHER COOK,<br>Claimant. | Case No. 20–CV–00667–JPG |

## MEMORANDUM & ORDER

This is a civil asset-forfeiture case. Before the Court is Claimant Christopher Cook's Motion to Dismiss. (ECF No. 14). The Government responded. (ECF No. 19). For the reasons below, the Court **DENIES** Cook's Motion.

**I.   PROCEDURAL & FACTUAL HISTORY**

In February 2020, two task-force officers with the DEA observed Cook driving along Interstate-70 in Illinois. (Thebeau Decl. at 1, ECF No. 1-1). He was in a white car that "was extremely dirty . . . ." (*Id.*). He was also driving with "the driver's side rear window . . . partially down," which the officers thought "was suspicious due to the outside temperature being approximately 30 degrees." (*Id.*). The officers followed him and noticed that he was tailgating the car in front of him. (*Id.*). They also noticed that he "had a material obstruction in the front windshield, which appeared to be a bracket for holding a cell phone or a GPS system." (*Id.* at 1–2). Then they "observed the vehicle travel over the white fog line." (*Id.* at 2). Based on these traffic violations (*i.e.*, tailgating, obstructed view, and improper lane usage), the "[o]fficers determined that there was sufficient probable cause to conduct a traffic stop . . . ." (*Id.*).

When the officers approached, Cook "rolled down all four windows of the vehicle." (*Id.*). The officers thought that he "was attempting to air out the vehicle from possible drug odor or a masking agent odor." (*Id.*).

Cook then handed over his driver's license, and the officers learned that he was from California. (*Id.*). He clarified that he was actually "a student in Utah" but was originally from California. (*Id.*). He said that his grandmother recently moved to Indiana and left some of her belongings in California, so he went to Indiana to deliver those items and help her move. (*Id.* at 2–3). The officers found that story suspicious because "there were not any current holidays which would explain why Cook may be on a school break." (*Id.*).

Other circumstances raised alarms to the officers. For one, they found it suspicious that Cook never rolled his windows up despite the winter weather. (*Id.* at 3). Cook also looked "visibly nervous," evidenced by shaky hands and constricted pupils. (*Id.*). Moreover, they "observed in plain view, two large duffle bags laying flat in the rear area of the vehicle." (*Id.*). In their experience, bags like these are commonly used "to transport large quantities of illegal drugs." (*Id.*). Next, after researching the vehicle's license plate, the officers discovered that Cook did not own the car—it belonged to Lisa Cook. (*Id.*). From the officers' perspective, "drug traffickers utilize third party vehicles in an attempt [to] not have the vehicle seized if caught by law enforcement transporting illegal drugs." (*Id.*). Finally, one of the officers "Googled Cook's address" and learned that his hometown in California is "near the Emerald Triangle," which "is known for growing the largest amount of cannabis in the United States." (*Id.*).

After the officers "completed their enforcement action" and gave Cook back his driver's license, they informed him that they "were going to detain his vehicle until a K-9 arrived, because [they] believed Cook may be involved in illegal activity." (*Id.* at 3–4). They asked him whether

"he had anything illegal in the car and Cook advised he did not." (*Id.* at 4). The K-9, however, "gave a positive indication . . . for the odor of narcotics." (*Id.*). Again, the officers asked Cook whether "there was any type of illegal drugs in the vehicle. Cook advised he had 'pot' in the center console area" and "also admitted that he had approximately $120,000 in United States currency in the vehicle." (*Id.*). The officers told him that they "had probable cause to search his vehicle" and indeed "located three glass jars in the center console containing a green leafy substance, which according to the jars['] labeling contained cannabis." (*Id.*). The two large duffel bags previously observed—Revelry brand—were practically empty but emanated "a strong odor of raw cannabis." (*Id.*). One bag, however, contained "several large storage Ziploc bags." (*Id.*). According to the officers, "Revelry bags are commonly used to traffic illegal drugs, due to their odor absorbing technology." (*Id.*). They also found "a glass smoking pipe with suspected burnt marijuana residue located in the center console." (*Id.*). Finally, the officers inspected "a large gray Nike duffle bag" and found "several rubber banded bundles of United States currency" beneath some clothes. (*Id.*).

Based on these suspicious findings, the officers seized the money. (*Id.*). One officer asked Cook whether he wanted to say a few words "concerning the contents of his vehicle and Cook responded, 'I can't, they will kill me.'" (*Id.* at 5). The officer then "asked Cook if all the currency . . . belonged to him and Cook said that it did." (*Id.*).

The Government launched this civil asset-forfeiture case to perfect the seizure. (*See* Compl. at 1, ECF No. 1). Cook then moved for dismissal, arguing that the Government's allegations do not establish a nexus between the money and illegal narcotics activity. (*See* Cook's Mot. at 2).

## II.     LAW & ANALYSIS

Even when there is no criminal prosecution, the Government can still seize cash that it believes is traceable to drug trafficking. *See* 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983(a)(3)(B). That said, "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *In re One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939); *see In re $506,231*, 125 F.3d 443, 454 (7th Cir. 1997) ("We are certainly not the first court to be 'enormously troubled by the Government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for the due process that is buried in those statutes.' ") (quoting *In re All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir. 1992)). The burden of proof rests with the Government:

> **(c) Burden of proof.**—In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—
>
> (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;
>
> (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and
>
> (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. § 983(c).

To institute a civil asset-forfeiture proceeding, the Government must first file a complaint that alleges "sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of proof at trial." Supplemental Rule G(2)(f) of the Federal Rules of Civil Procedure [*hereinafter* "Rule G"].

> Of course, probable cause is required to initiate a forfeiture action. . . . To establish probable cause, the Government must demonstrate a reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion. Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity. The Government may rely on direct evidence as well as on circumstantial and hearsay evidence. Probable cause for the forfeiture exists if the Government demonstrates a *nexus* between the seized property and illegal narcotics activity.

*In re $506,231*, 125 F.3d 442, 451 (7th Cir. 1997) (emphasis in original) (internal quotation marks omitted).

"A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Rule G(5)(a)(i). The claimant may then move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Rule G(5)(b); Rule G(8)(b)(i).

To survive a motion to dismiss for failure to state a claim, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 12(b)(6). Although "detailed factual allegations" are not required, the complaint must still "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Where a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). That said, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D).

Cook argues that the Government's Complaint[1] present "ambiguous facts that constitute, at best, mere suspicion and conjecture that the money is traceable to illegal drug proceeds or was intended for an illegal drug transaction." (Cook's Mot. at 3). More specifically, he says that the pipe, open windows, and jars of marijuana found in the vehicle merely suggest that he is a user—not a distributor. (*Id.* at 6–7). Similarly, he suggests that the K-9 simply alerted to the scent of marijuana generally in the vehicle—not the scent of marijuana on the cash itself. (*Id.* at 7). This too, he says, only suggests that he was a marijuana user. (*Id.*). In short, Cook contends that "[t]here is no credible evidence connecting [the] money to drug trafficking." (*Id.* at 13). The Court disagrees.

Accepting its allegations as true, the Government has established reasonable grounds for the belief of guilt supported by a substantial chance of criminal activity. True enough, "[t]he existence of any sum of money, **standing alone**, is not enough to establish probable cause to believe the money is forfeitable." *In re $506,231*, 125 F.3d at 452 (emphasis added). But the Government did not launch this action merely based on the "bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics

---

[1] The Seventh Circuit has "taken a broader view of documents that may be considered on a motion to dismiss, noting that a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Here that includes Officer Thebeau's Declaration, which was attached to the Government's Complaint and incorporated by reference.

trafficking or some other sinister activity." *See id.* at 454 (emphasis in original). Rather, it pointed to *additional* evidence suggestive of drug trafficking. For example, the Government noted that Cook's hometown was near California's Emerald Triangle, which apparently has a reputation for marijuana cultivation. And in *In re $30,670*, the Seventh Circuit considered the fact that a claimant was traveling to "a recognized source city for illegal narcotics" as a relevant factor supporting forfeitability. 403 F.3d 448, 467 (7th Cir. 2005). The court also noted that the claimant "appeared increasingly nervous and evasive during his conversation with the DEA agents," and that his "explanations regarding the sources of his cash did not add up." *Id.* at 468. Here too, the Government says that Cook had shaky hands and constricted pupils. The Government also alleges that Cook refused to discuss the source of the cash by stating, "I can't, they will kill me." These facts help nudge the Government's claim from *possible* to *plausible*. Moreover, two large duffel bags of the type commonly used to transport drugs because of their odor-masking qualities were found in Cook's car. And while Cook suggests that he was merely a marijuana user, using and dealing are not mutually exclusive activities.[2] At this stage of the case, the Court must accept the Government allegations as true. *Iqbal*, 556 U.S. at 678. And "consider[ing] the totality of the evidence as a whole and in the appropriate context," the Court finds that the Government has pleaded enough factual content to establish a nexus between the seized cash and criminal activity. *See In re $30,670*, 403 F.3d at 469.

---

[2] As for the K-9 alert, the Seventh Circuit in *In re $30,670* said that "a properly trained dog's alert **to currency** should be entitled to probative weight." 403 F.3d at 459 (emphasis added). As Cook notes, however, the Government only alleges that the K-9 alerted to the vehicle itself, not the currency. Given that there was, in fact, marijuana in the car, the K-9's alert does not, by itself, link the cash to drug trafficking. Thus the Court will give the K-9 alert less weight.

— 8 —

### III. CONCLUSION

The Court **DENIES** Claimant Christopher Cook's Motion to Dismiss.

**IT IS SO ORDERED.**

**Dated: Friday, March 26, 2021**

<u>S/J. Phil Gilbert</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**