IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>$128,915.00<br>Defendant.<br>_____<br><br>CHRISTOPHER COOK,<br>Claimant. | Case No. 20–CV–00667–JPG |

**MEMORANDUM & ORDER**

This is a civil asset-forfeiture case. Before the Court is Claimant Christopher Cook's Motion to Suppress. (ECF No. 22). The Government responded. (ECF No. 23). For the reasons below, the Court **DENIES** Cook's Motion.

I.   **PROCEDURAL & FACTUAL HISTORY**

In February 2020, two task-force officers with the DEA observed Cook driving along Interstate-70 in Illinois. (Thebeau Decl. at 1, ECF No. 1-1). He was in a white car that "was extremely dirty . . . ." (*Id.*). He was also driving with "the driver's side rear window . . . partially down," which the officers thought "was suspicious due to the outside temperature being approximately 30 degrees." (*Id.*). The officers followed him and noticed that he was tailgating the car in front of him. (*Id.*). They also noticed that he "had a material obstruction in the front windshield, which appeared to be a bracket for holding a cell phone or a GPS system." (*Id.* at 1–2). Then they "observed the vehicle travel over the white fog line." (*Id.* at 2). Based on these traffic violations (*i.e.*, tailgating, obstructed view, and improper lane usage), the "[o]fficers determined that there was sufficient probable cause to conduct a traffic stop . . . ." (*Id.*).

When the officers approached, Cook "rolled down all four windows of the vehicle." (*Id.*). The officers thought that he "was attempting to air out the vehicle from possible drug odor or a masking agent odor." (*Id.*).

Cook then handed over his driver's license, and the officers learned that he was from California. (*Id.*). He clarified that he was actually "a student in Utah" but was originally from California. (*Id.*). He said that his grandmother recently moved to Indiana and left some of her belongings in California, so he went to Indiana to deliver those items and help her move. (*Id.* at 2–3). The officers found that story suspicious because "there were not any current holidays which would explain why Cook may be on a school break." (*Id.*).

Other circumstances raised alarms to the officers. For one, they found it suspicious that Cook never rolled his windows up despite the winter weather. (*Id.* at 3). Cook also looked "visibly nervous," evidenced by shaky hands and constricted pupils. (*Id.*). Moreover, they "observed in plain view, two large duffle bags laying flat in the rear area of the vehicle." (*Id.*). In their experience, bags like these are commonly used "to transport large quantities of illegal drugs." (*Id.*). One officer also "observed a bottle of Ozium air sanitizer, which [he] believed was being used to possibly mask a drug odor." (*Id.*). Then, after researching the vehicle's license plate, the officers discovered that Cook did not own the car—it belonged to Lisa Cook. (*Id.*). From the officers' perspective, "drug traffickers utilize third party vehicles in an attempt [to] not have the vehicle seized if caught by law enforcement transporting illegal drugs." (*Id.*). Finally, one officer "Googled Cook's address" and learned that his hometown in California is "near the Emerald Triangle," which "is known for growing the largest amount of cannabis in the United States." (*Id.*).

After the officers "completed their enforcement action" and gave Cook back his driver's license, they informed him that they "were going to detain his vehicle until a K-9 arrived, because [they] believed Cook may be involved in illegal activity." (*Id.* at 3–4). They asked him whether "he had anything illegal in the car and Cook advised he did not." (*Id.* at 4). But about 15 minutes later, (Gov't Resp. at 6; Cook Decl. at 1, ECF No. 22-1), the K-9 arrived and "gave a positive indication . . . for the odor of narcotics," (Thebeau Decl. at 4). Again, the officers asked Cook whether "there was any type of illegal drugs in the vehicle. Cook advised he had 'pot' in the center console area" and "also admitted that he had approximately $120,000 in United States currency in the vehicle." (*Id.*). The officers told him that they "had probable cause to search his vehicle" and indeed "located three glass jars in the center console containing a green leafy substance, which according to the jars['] labeling contained cannabis." (*Id.*). The two large duffel bags previously observed—Revelry brand—were practically empty but emanated "a strong odor of raw cannabis." (*Id.*). One bag, however, contained "several large storage Ziploc bags." (*Id.*). According to the officers, "Revelry bags are commonly used to traffic illegal drugs, due to their odor absorbing technology." (*Id.*). They also found "a glass smoking pipe with suspected burnt marijuana residue located in the center console." (*Id.*). Finally, the officers inspected "a large gray Nike duffle bag" and found "several rubber banded bundles of United States currency" beneath some clothes. (*Id.*).

Based on these suspicious findings, the officers seized the money. (*Id.*). One officer asked Cook whether he wanted to say a few words "concerning the contents of his vehicle and Cook responded, 'I can't, they will kill me.'" (*Id.* at 5). The officer then "asked Cook if all the currency . . . belonged to him and Cook said that it did." (*Id.*).

The Government launched this civil asset-forfeiture case to perfect the seizure. (*See* Compl. at 1, ECF No. 1). Cook then moved to suppress the evidence, arguing that the officers lacked a reasonable suspicion to prolong the search after they completed their enforcement action. (*See* Cook's Mot. at 5–9).

## II.   LAW & ANALYSIS

Even when there is no criminal prosecution, the Government can still seize cash that it believes is traceable to drug trafficking. *See* 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983(a)(3)(B). That said, "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *In re One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939); *see In re $506,231*, 125 F.3d 443, 454 (7th Cir. 1997) ("We are certainly not the first court to be 'enormously troubled by the Government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for the due process that is buried in those statutes.' ") (quoting *In re All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir. 1992)). Ultimately, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c).

To launch a civil asset-forfeiture proceeding, the Government must first file a complaint that alleges "sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of proof at trial." Supplemental Rule G(2)(f) of the Federal Rules of Civil Procedure [*hereinafter* "Rule G"].

"A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Rule G(5)(a)(i). The claimant may then move to suppress the seized property under the Fourth Amendment's *exclusionary rule*. *See* Rule G(8)(a). *But see United States v. Marrocco*, 578 F.3d 627, 642–43 (7th Cir. 2009)

(Easterbrook, J., dissenting) (expressing doubt that the exclusionary rule applies to civil asset forfeitures).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "No right is held more sacred, or is more carefully guarded, by the common law, then the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). And "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Relevant here, "[g]iven the nature of an automobile in transit, the [Supreme] Court recognized that an immediate intrusion" is not unreasonable "in cases involving the transportation of contraband goods." *United States v. Ross*, 456 U.S. 798, 806–807 (1982).

> An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime. An officer initiating an investigatory stop must be able to point to "specific and articulable facts" that suggest criminality so that he is not basing his actions on a mere hunch.

*United States v. Uribe*, 709 F.3d 646, 649–50 (7th Cir. 2013) (quoting *Terry*, 392 U.S. at 21–22).

"The government bears the burden of establishing reasonable suspicion by a preponderance of the evidence." *Id.* at 650. But *reasonable suspicion* itself "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

Relatedly, it is now well established "that the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.")). And the Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Courts therefore evaluate *reasonable suspicion* by examining "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Bullock*, 632 F.3d at 1012. "If there is no reasonable suspicion of criminal activity, a traffic stop can only last as long as it takes to 'address the traffic violation that warranted the stop' and 'attend to related safety concerns.' " *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016) (quoting *Rodriguez*, 575 U.S. at 354). In other words, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can

become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. "However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007).

Ultimately, "[i]n cases where the securing of a warrant is reasonably practicable, it must be used . . . ." *Carrol v. United States*, 267 U.S. 132, 156 (1925). The Supreme Court has mandated "strict adherence to that command" using the *exclusionary rule*: "a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to 'a form of words.'" *Mapp v. Ohio*, 367 U.S. 643, 49 (1961) (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)).

Cook argues that the officers conducted an unreasonable search and seizure by prolonging the stop to conduct a K-9 sniff. (Cook's Mot. to Suppress at 6–7). The Court disagrees.

Although Cook claims to urge the Court to consider the totality of the circumstances, as it must, his Motion takes a piecemeal approach. But the Supreme Court has expressly "preclude[d] this sort of divide-and-conquer analysis." *See United States v. Arvizu*, 534 U.S. 266, 274 (2002). More specifically, Cook says:

> Objectively speaking, because one puts their windows down during a traffic stop, in the absence of an odor of marijuana or a masking agent, can the Court rationally infer criminal activity afoot? Likewise, because one resides in northern California and has two empty duffle bags in the back seat, can the Court rationally infer criminal activity afoot? Since the Court must consider the totality of the circumstances, [i]s it likely that Cook was returning to the

> "Emerald Triangle" traveling on Interstate 70, or more likely traveling back to school in Utah?"

(Cook's Mot. to Suppress at 7–8). True, these facts, **taken in isolation**, may not be enough to carry the Government's burden. But when considered together, they establish that the officers had a reasonable suspicion of criminal activity justifying the prolonged traffic stop. The Government did not launch this action merely based on the "bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics trafficking or some other sinister activity." *See In re $506,231*, 125 F.3d at 452, 454 (emphasis added). Rather, the Government noted that Cook's hometown was near California's Emerald Triangle, which apparently has a reputation for marijuana cultivation. And in *In re $30,670*, the Seventh Circuit considered the fact that a claimant was traveling to "a recognized source city for illegal narcotics" as a relevant factor supporting forfeitability. 403 F.3d 448, 467 (7th Cir. 2005). The court also noted that the claimant "appeared increasingly nervous and evasive during his conversation with the DEA agents," and that his "explanations regarding the sources of his cash did not add up." *Id.* at 468. Here too, the Government says that Cook had shaky hands and constricted pupils. Moreover, two large duffel bags of the type commonly used to transport drugs because of their odor-masking qualities were found in Cook's car. And while Cook asserts the lack of a masking agent, one officer **did** observe "a bottle of Ozium air sanitizer, which [he] believed was being used to possibly mask a drug odor." (Thebeau Decl. at 4). Of course, the fact that Cook was driving with his windows down in 30-degree weather created further suspicion that he might be airing out his car. Now, Cook tries to offer some explanations for these apparent peculiarities; but what matters at this stage is whether the officers had a reasonable suspicion of criminal activity *at the time of the seizure*. Naturally, Cook's explanations were absent then. But more importantly, the reasonable-suspicion standard is low and can turn on information that is less reliable than probable

cause. And taken as a whole, the officers could articulate several specific indicators of criminal activity—including visible nervousness, a masking agent, large duffle bags, driving with the windows down in the winter, and Cook's hometown as a marijuana haven—that sustained a reasonable suspicion and therefore justified further investigation. In sum, there was no Fourth Amendment violation.

### III.  CONCLUSION

The Court **DENIES** Claimant Christopher Cook's Motion to Suppress.

**IT IS SO ORDERED.**

**Dated: Tuesday, June 15, 2021**

S/J. Phil Gilbert
J. PHIL GILBERT
UNITED STATES DISTRICT JUDGE
